AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

**FILED**
United States District Court
Albuquerque, New Mexico

Erik Paltrow
Clerk of Court

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>1002 Edith Blvd. NE, APT-C Albuquerque, New Mexico<br>87102 | )<br>)<br>)  Case No.  MR 26-1597<br>)<br>)<br>) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A (incorporated by reference)

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1) | Possession with intent to distribute methamphetamine |
| 21 U.S.C. 846 | Conspiracy |

The application is based on these facts:

The affidavit of DEA TFO Erick Castaneda is incorprated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Erick D. Castañeda*
*Applicant's  signature*

Erick Castaneda, DEA Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_Telephonically Sworn and Electronically Signed_  *(specify reliable electronic means).*

Date:  July 30, 2026

*Judge's signature*

City and state:  Albuquerque, New Mexico          John F. Robbenhaar, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF:

**1002 EDITH BLVD NE, APT-C
ALBUQUERQUE, NM, 87102**

Case No. _____

## <u>AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE</u>

I, Erick D. Castañeda being first duly sworn, hereby depose and state as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as **1002 Edith Blvd NE, Apt-C, Albuquerque, New Mexico** (hereinafter referred to as "PREMISES," further described in Attachment A, for the things described in Attachment B.

2.      I have been assigned as a Task Force Officer ("TFO") to the Drug Enforcement Administration ("DEA") since June 2020. Prior to that I worked as a full-time sworn Law Enforcement Officer with the Bernalillo County Sheriff's Office and have been so employed since June 2015. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request arrest and search warrants. Furthermore, I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations and to make arrests for criminal offenses,

to include those enumerated in 18 U.S.C. § 2516. I received training on surveillance and counter-surveillance operations, undercover operations, confidential source operations, criminal law, and investigations involving federal electronic surveillance statutes, drug identification, search warrant executions, and vehicle stops.

3.    My experience as a Sheriff's Deputy and TFO includes, but is not limited to, conducting surveillance, interviewing witnesses, writing affidavits for and executing search and seizure warrants, debriefing defendants and confidential sources and working with undercover agents and informants. I have also conducted approximately 100 undercover operations in both English and Spanish. I have received training and have experience in the investigation of violations of the federal drug and money laundering laws, including the offenses listed below. As a result, I am familiar with matters including, but not limited to, the means and methods used by drug traffickers and drug trafficking organizations to purchase, transport, store, and distribute illegal drugs and to hide profits generated from those transactions.

4.    I have been involved in an ongoing investigation regarding the distribution of controlled substances, specifically methamphetamine and fentanyl by Raudel Sinahi ZUBILLAGA Rey ("ZUBILLAGA"). Since the investigation's inception, I, as well as other Special Agents ("SA") and TFOs with the DEA and law enforcement officials from other agencies have obtained information regarding the illegal drug trafficking activities of Raudel Sinahi ZUBILLAGA Rey and others (the "SUBJECTS").

5.      I make this affidavit based upon my own personal knowledge, which is substantially derived from my participation in the investigation, as well as that of fellow agents and officers who have participated in the investigation.  In addition, I have developed information I believe to be reliable from additional sources including

    a.      Information provided by Task Force Officers ("TFO"), Special Agents ("SA"), and Intelligence Research Specialists (IRS) of the DEA and other law enforcement officials ("agents"), including oral and written reports that I have received directly or indirectly from said investigators;

    b.      Results of physical surveillance conducted by agents during the investigation;

    c.      A review of telephone toll records and subscriber information;

    d.      Information derived from consensually recorded conversations;

    e.      Information derived from lawfully intercepted telephone conversations and text messages;

    f.      A review of driver's license and automobile registration records;

    g.      Records from commercial databases; and

    h.      Records from the National Crime Information Center ("NCIC").

6.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**FEDERAL CHARGES RELEVANT TO THIS INVESTIGATION**

7.      I believe there is probable cause that the SUBJECTS have committed, are committing, and will continue to commit offenses involving violations of, *inter alia:*

a.      21 U.S.C. § 841 – Distribution and possession with intent to distribute controlled substances;

b.      21 U.S.C. § 846 – Conspiracy to distribute and possess with intent to distribute controlled substances;

**EVIDENCE SOUGHT DURING SEARCH**

8.      Based on my training, experience and participation in this and in similar investigations, I believe that individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug trafficking activities in their residences and businesses, or the residences of friends or relatives, and in surrounding areas to which they have ready access such as garages, carports and outbuildings.  They also conceal evidence in vehicles, including vehicles outside of their residences and businesses, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences or businesses.  Evidence also may be found in other areas to which a drug dealer has ready access, such as rented storage areas and safety deposit boxes, or buried underground on their property.  This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for weighing, packaging and distributing controlled substances, other contraband, records, documents,

4

as well as evidence of drug transactions, proceeds from drug sales, and valuables obtained from proceeds.

9.    Individuals involved in illegal drug trafficking of controlled substances often keep quantities of controlled substances on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in their vehicles, in off-site storage facilities, and in other areas to which they have ready access.

10.    Individuals involved in drug dealing commonly use certain paraphernalia to package and prepare controlled substances for distribution.  The paraphernalia includes, but is not limited to, packaging materials (such as plastic baggies, wrapping paper, cellophane, condoms, and film canisters) and scales to weigh controlled substances.  Drug dealers commonly store these items on their person, in their residences, in their businesses, in their residences of friends or relatives, in their vehicles, and in other areas to which they have ready access.

11.    Drug traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records are often maintained for long periods of time, even years, to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators.  These records may be maintained on paper, in the form of business and personal ledgers and

diaries, calendars, memoranda, pay/owe sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books. These records can reflect names, addresses and/or telephone numbers of associates and co-conspirators, the sale and purchase of controlled substances including precursors, customer lists, and amounts of money owed to the trafficker by customers and by the trafficker to his/her suppliers.

12.     Drug traffickers often travel domestically and internationally to facilitate their trafficking.  Evidence of foreign and domestic travel by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts, passports, and visas. These items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of relatives and in cars.  Many of these items are accessible via the internet and can be downloaded and saved on the computer or other digital media and on storage media.

13.     Drug traffickers often use storage facilities for drugs and other items related to trafficking that are at a location away from their residences and businesses. These off-site storage facilities are often commercial storage lockers and rooms.  These locations are often used to store or hide drugs, contraband, money and other valuables. Drug traffickers often keep documents and other items tending to show the existence of other stored drugs, contraband, money and other valuables in areas such as storage facilities.  Those documents and other items include rental agreements, receipts, keys, notes and maps specifically concerning off-site storage rooms, lockers, and safety deposit

6

boxes.  This evidence may be found on their person or in their businesses, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

14.    Other evidence of transportation, ordering, possession and sale of drugs can include the following:  telephone bills to show numbers called by the drug dealers (and hence potential associates), overnight mail receipts, bank statements, deposit and withdrawal slips, savings books, investment statements, loan statements, other financial institution statements, and federal and state tax returns.  The above items are stored by drug dealers on their person or in their business, residences and surrounding garages, outbuildings, carports and yards, the residences of friends or relatives, and cars.  This type of documentation can be stored on digital media and concealed virtually anywhere.

15.    Drug traffickers usually sell their product for cash.  Because large quantities of drugs can sell for thousands of dollars at the wholesale level, dealers may have thousands of dollars in cash on hand both as proceeds of sales and to purchase supplies/inventory.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, and other valuables.

16.    Individuals involved in drug dealing often try to legitimize these profits from the sale of drugs.  To accomplish this goal, drug traffickers may utilize foreign

7

and/or domestic banking institutions and their attendant services, real estate and businesses, both real and fictitious. They also try to secret, transfer and conceal the money by (a) placing assets in names other than their own to avoid detection while maintaining control, (b) laundering money through what appears to be a legitimate business or businesses, (c) hiding the money in their homes, safes and safety deposit boxes, and/or (d) using the money to buy assets which are difficult to trace. This evidence is useful in a criminal prosecution, and it also is useful in identifying real and personal property that can be seized and forfeited by the government under existing laws. Documentation concerning this type of activity can be stored on digital media and concealed virtually anywhere.

17.    Evidence of significant, unexplained income of drug dealers, or for the acquisition and concealment of money and assets of drug sales, can be found on banking and investment account statements, credit card account statements, canceled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), vehicle and property rental records, lease and purchase agreements, and canceled mail. These records can be maintained on paper, but also can be maintained as electronic data on computers

and other digital media.  The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

18.    The use of digital media, including smartphones, tablets, cellular phones, and digital devices, has become part of everyday life. This is also true for drug traffickers. Information stored in electronic form on all of the above-devices can provide evidence of drug trafficking. Drug traffickers frequently use some or all of these devices to communicate with co-conspirators, customers, sources of supply, and others involved in the drug trade. These communications include, but are not limited to, phone calls, text messages, SMS (Short Message Service) messaging, MMS (Multimedia Messaging Service) messaging, social media posts and messaging, and smartphone application messaging services. Smartphones, tablets, cellular phones, and digital devices are frequently capable of storing messages, emails, social media communications, and communications made over smartphone applications. The content of these communications will often provide evidence of drug trafficking. Numbers stored on a telephone (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.

19.    Drug traffickers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property and their drugs.  They usually

9

maintain these photographs and/or videos on their person or in their businesses, residences or cars, on computers, or in the residences of friends or relatives. Smartphones, tablets, cellular phones, digital cameras, and other digital devices, often have the capability to take still photos and videos and save them indefinitely on the device's storage medium. Drug traffickers frequently use these devices to take their photographs and videos.

20.    Drug traffickers often maintain firearms and ammunition on their person or in their homes, businesses or cars to protect themselves and their drugs and their drug profits.  They also may maintain indicia of firearms such as receipts for firearms and ammunition, boxes for firearms and ammunition, firearms cleaning supplies, and instruction manuals and other documentation for firearms and ammunition.

21.    I know that weapons (including rifles, shotguns, and handguns) are tools of the trade for drug traffickers, who often keep firearms in close proximity to themselves, and their product and proceeds, to protect them from other drug traffickers and law enforcement.

22.    Drug traffickers often conceal evidence of drug dealing in vehicles outside of their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences.  This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packing documents and electronic storage devices (and their contents,) evidence tending to show

10

the distribution of drugs (such as IOUs, pay-owe sheets, ledgers, lists of names and numbers, telephone address books, etc.), digital devices such as cellular/mobile/smart telephones and tablets (and their contents), and counter-surveillance devices.

23.    Drug traffickers often utilize digital video surveillance systems. A digital video surveillance system is a surveillance system that is capable of capturing images, videos, and audio that can be compressed, stored or sent over communication networks. I know that it is common for digital surveillance systems to contain storage media that allow for 30 days or more of camera footage to be stored on the system. Digital video surveillance systems can be used for nearly any environment, including a commercial business or residence. I know that drug traffickers make use of video surveillance systems to monitor who is approaching their residence and assess whether the person presents a threat to the trafficker's drugs or drug proceeds. Drug traffickers also utilize surveillance equipment to obtain advance notice when law enforcement arrives to hide or destroy evidence of criminal activity. However, given the constant recording that occurs with a digital surveillance system, it is also common that the digital video surveillance system will also depict evidence of the residents' drug trafficking activities and conversations related to drug trafficking.

24.    Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the

11

persons owning, residing in or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, outgoing answering machine messages, tax returns, keys, deeds and mortgage receipts.  These documents may also be produced on computers, downloaded from online accounts or scanned into digital format and stored on computers and related digital media.

25.     The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware. The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.  The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium. Collectively, the terms "computer," "digital media," and "storage media" are referred to as "electronic media."

26.     A list of items agents seek authority to seize is in Attachment B.

### ELECTRONIC MEDIA AND FORENSIC ANALYSIS

27.     As described above and in Attachment B, this application seeks permission to search for evidence and records that might be found on the PREMISES, in whatever form they are found.  Much of the evidence and records described in the

12

paragraphs above, and in Attachment B, can also be produced and/or stored on electronic media.  For this reason, I submit that if a computer, digital medium, or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer, digital medium, or storage medium. Thus, the warrant applied for would authorize the seizure of electronic media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

28.     *Necessity of seizing or copying entire electronic media.*  In most cases, a thorough search of a premises for information that might be stored on electronic media often requires the seizure of the physical electronic media and later off-site review consistent with the warrant. In lieu of removing electronic media from the premises, it is sometimes possible to make an image copy of electronic media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the electronic media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that

13

much time on premises could be unreasonable. Electronic media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the electronic media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.  Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of electronic media formats that may require off-site reviewing with specialized forensic tools.

29.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying electronic media that reasonably appear to contain some or all of the evidence

described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the computer or entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

30.     The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

a.  I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

15

b.  If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a

16

more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was

last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the PREMISES and reasonably believed

18

by law enforcement to be a user of the device, to unlock the device using biometric features in the same manner as discussed above.

h.  Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the PREMISES and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

**PROBABLE CAUSE**

**Background**

31.     The United States, including the DEA, is conducting a criminal investigation of drug courier Raudel ZUBILLAGA-Rey ("ZUBILLAGA") and source of supply ("SOS")   Erick Humberto ARELLANO-Arellano ("ARELLANO") regarding possible violations of 21 U.S.C. §§ 841 (a)(1) and 846, that being possession with intent to distribute controlled substances, distribution of controlled substances, and conspiracy.

19

32.    In January 2026, TFO Castañeda was contacted by DEA SA S. Hollice from Denver, Colorado, with information regarding a Mexican SOS who has a drug network established in Salt Lake City, Utah; Las Vegas, Nevada; Los Angeles, California; Denver, Colorado; and Albuquerque, New Mexico.

33.    SA Hollice stated they had an undercover (hereinafter referred to as "UC-1") who was in contact with a Mexican SOS known as "Gerardo" utilizing telephone number +52 311 253 9492. "Gerardo" told UC-1 to send him any people they knew in Albuquerque, NM, wanting to purchase drugs. TFO Castañeda provided UC-1 with his UC telephone number to pass along to "Gerardo". TFO Castañeda was to act as the Albuquerque, NM purchaser (hereinafter referred to as "UC-2") and communicate with the Mexican SOS "Gerardo".

34.    On Tuesday January 27, 2026, UC-2 received a phone call from Mexican phone number +52 311 343 2174. UC-2 answered and the male identified himself as "Erick". Erick advised UC-2 that he obtained UC-2's phone number from UC-1. Erick asked UC-2 what drugs UC-2 purchased in Albuquerque and UC-2 told him everything. Erick then stated he only had "el fuertecito" or "el feo". UC-2 knows those terms are Spanish street slang referring to fentanyl powder. UC-2 asked if they had any fentanyl pills and Erick stated they had a few left, but they were not good quality. Erick stated the fentanyl powder would be $750 per ounce. UC-2 asked Erick if UC-2 would be meeting with him directly and Erick stated he would be directing his courier to meet with UC-2.

20

UC-2 told Erick that UC-2 would be contacting him in the coming days. This concluded the phone conversation.

**CONTROLLED PURCHASE #1**

35.    On January 29, 2026, UC-2 contacted "Erick" at phone number +52 311 343 2174. During this call, UC-2 inquired about purchasing 2 ounces of fentanyl powder. "Erick" confirmed the price would be $750 per ounce or $1,500 total. UC-2 told "Erick" that UC-2 could meet around 2:00 p.m., and UC-2 would contact him later in the day to confirm the place and time.

36.    At approximately 1:24 p.m., UC-2 sent a text message to "Erick" asking if he could meet at 2821 Phillips Dr SW at 2:30 p.m., which "Erick" agreed. "Erick" stated he would be in a white Honda Civic. UC-2 told Erick that UC-2 would be in a blue Ram truck and told "Erick" to get into UC-2's vehicle once he arrived to the meet location.

37.    At approximately 2:32 p.m., "Erick" texted UC-2 stating his courier was at the meet location. UC-2 told him that UC-2 would be there shortly. Agents then observed a white Honda Civic bearing New Mexico License Plate: 025XKZ[1] occupied by one Hispanic male arrive at the meet location and park in a center parking row facing west.

---

[1] According to MVD Records, this license plate belongs to a white 2005 Honda Civic VIN: 2HGES267X5H540864 to Felix Velasco Zaragoza at 17 John Wayne, Edgewood, NM, 87015

38.     At approximately 2:50 p.m., UC-2 arrived at the meet location and parked in the center parking row just south of the white Honda Civic. Shortly after, the Hispanic male exited the Honda Civic and walked to UC-2's vehicle. The Hispanic male got into the front passenger seat of UC-2's vehicle and retrieved two white plastic baggies from his front right pants pocket. The plastic baggies contained an off white powdery substance wrapped in paper towels believed to be fentanyl powder. UC-2 then handed the Hispanic male $1,500. UC-2 asked the Hispanic male if UC-2 could have his phone number to contact him in the future to expedite the drug transactions. The Hispanic male retrieved his phone and stated he did not know his number and had to look it up. The Hispanic male provided a phone number of 505-382-7902 and identified himself as "Raul". UC-2 and "Raul" said their goodbyes and both departed the area separately.

39.     Agents maintained surveillance on the Honda Civic and observed it arrive at 2504 Leo Rd SW, Albuquerque, NM. The Honda Civic parked in the rear of the property out of view from Agents and departed after approximately 5 minutes.

40.     Agents maintained surveillance and observed the Honda Civic arrive at 3235 NM-47, Los Lunas, NM, 87031. The Honda Civic parked outside the gate and an older Hispanic male came out and walked up to the vehicle. Agents then observed "Raul" exit the vehicle and walk inside the property with the older Hispanic male. Agents observed "Raul" go inside the residence and after approximately 1-2 minutes "Raul" exited the residence by himself and walked back to the Honda Civic and departed the area.

22

41.    Agents maintained surveillance once again and followed "Raul" to a parking lot located at 5001 Montgomery Blvd NE. Raul remained inside the vehicle for approximately 50 minutes before he exited and went inside the Hibbett Sports store. After approximately 6 minutes, "Raul" exited and departed the area in the Honda Civic.

42.    During surveillance, "Raul" drove approximately 10-15 MPH slower than the posted speed limit. Agents know from experience, this is a common counter-surveillance tactic utilized by drug traffickers to detect law enforcement. This tactic made it difficult for Agents to maintain surveillance without appearing suspicious.

43.    Agents conducted a traffic stop on the white Honda Civic utilizing a marked Bernalillo County Sheriff's Office ("BCSO") patrol unit . The Honda Civic was stopped at 2120 Louisiana Blvd NE. Deputies obtained the driver's license for "Raul" who was the sole occupant. The driver's license identified "Raul" as Raudel Sinahi ZUBILLAGA-REY (hereinafter referred to as "ZUBILLAGA"). Once identified, the Deputy released ZUBILLAGA with a  warning for tint and faulty equipment.

44.    UC-2 was shown the driver's license photograph of ZUBILLAGA. UC-2 was able to positively identify him as "Raul", the same individual that sold UC-2 the 2 ounces of fentanyl powder. After the traffic stop surveillance was terminated.

45.    Immediately after the controlled buy, UC-2 returned to the DEA Albuquerque District Office (ADO).  The fentanyl powder was field tested which resulted in a presumptive positive for the presence of fentanyl. The substance net weight was 56.5

grams. The fentanyl powder was sent to the South Central Laboratory for analysis and it was determined the substance was identified as N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (Fentanyl) (calc. as Hydrochloride) with a purity of 21% and a net weight of 49.27 grams.

## INTRODUCTION OF UC-3

46.     On days leading to February 7th, 2026, DEA Agents in Salt Lake City, Utah, contacted TFO Castaneda regarding an ongoing investigation in which a DEA UC was in contact with a SOS utilizing telephone number +52-311-910-0152. The user of x0152 asked the Salt Lake City UC if they knew anyone in Albuquerque, NM who wanted to purchase narcotics. TFO Castaneda asked the Salt Lake City UC to pass along a number for UC-3. UC-3 was to establish communications with the SOS and arrange controlled purchases in Albuquerque, NM.

47.     On February 7, 2026, UC-3 received a WhatsApp call from telephone number +52-311-909-3812. UC-3 and the user of x3812 established communications and UC-3 agreed to purchase narcotics in the near future. The name did not identify himself to UC-3.

48.     On this same date, UC-2 received a text message from telephone number +52-311-909-3812. The user identified himself as "Erick". "Erick" further stated that he was the one UC-2 met with at El Herradero during controlled purchase #1. "Erick" stated

he changed his telephone number and to contact him on his new number if UC-2 needed anything.

49.    At this point, UC-2 and UC-3 were in contact with the same telephone number and communicating with "Erick".

## CONTROLLED PURCHASE #2

50.    On February 9, 2026, at approximately 10:43 p.m., UC-3 contacted Erick at phone number +52-311-909-3812. During this call, UC-3 inquired about purchasing 1 ounce of fentanyl powder. Erick confirmed the price would be $750 for the ounce. UC-3 told Erick that UC-3 could meet around 2:30-3:00 p.m., in Belen, NM. Erick agreed and told UC-3 to send him the address.

51.    At approximately 1:32 p.m., UC-3 sent Erick an address for the Loves gas station located at 1903 Camino del Lano, Belen, NM, and told Erick that UC-3 will arrive around 2:00 p.m. Erick told UC-3 that he would give an ETA of his guy that will be delivering to UC-3 and stated his guy would be in a grey Hyundai Accent. At approximately 1:56 p.m., Erick told UC-3 that his guy would arrive in approximately 45 minutes.

52.    At approximately 2:20 p.m., UC-3 arrived at the meet location.

25

53.    At approximately 2:56 p.m., Agents observed a grey Hyundai Accent bearing New Mexico license plate CHFF05[2] arrive to the meet location and park next to the UC vehicle.

54.    Agents observed a male, identified by Agents from a previous controlled purchase, as Raudel ZUBILLAGA-Rey, get out of the Hyundai and into the front passenger seat of the UC vehicle. ZUBILLAGA provided UC-3 with the ounce of fentanyl powder and UC-3 handed ZUBILLAGA $750. UC-3 asked ZUBILLAGA to purchase two more ounces of fentanyl powder to which ZUBILLAGA stated UC-3 would have to contact Erick to order more product. UC-3 placed a call-in front of ZUBILLAGA to Erick and asked for two more ounces. Erick stated he could provide them later in the evening. UC-3 told Erick that UC-3 would be in Albuquerque later, and they could meet somewhere in Albuquerque.

55.    UC-3 hung up and told ZUBILLAGA UC-3 would contact Erick once he was ready to meet up later.

56.    At approximately 2:59 pm, Agents observed ZUBILLAGA get out of the UC vehicle and return to the Hyundai and depart the area. Surveillance was maintained on ZUBILLAGA.

---

[2] According to MVD Records: this license plate belongs to a grey 2014 Hyundai Accent VIN: KMHCT4AE9EU748361 to Raudel ZUBILLAGA at 107 Zorro Dr SE, Albuquerque, NM, 87105

57.    At approximately 3:39 pm, Agents observed ZUBILLAGA arrive at the Motel 6, located at 1701 University Blvd NE, Albuquerque, New Mexico 87102.

58.    At approximately 3:41 pm, Agents observed ZUBILLAGA get out of the Hyundai, walk up a staircase. At the time surveillance was unable to see which room ZUBILLAGA went into.

59.    At approximately 3:46 p.m., UC-3 received a call from Erick who asked UC-3 where they could meet. UC-3 asked to meet at a gas station near I-25 and Rio Bravo Blvd. Erick stated he would try and hurry his guy but he still needed to package the stuff and that he had to be careful packaging it because it was dangerous stuff.

60.    At approximately 3:52 p.m., UC-3 asked Erick to just meet at a gas station near Menaul/University. Erick agreed and asked UC-3 to send him the address. UC-3 sent Erick an address of 1915 Menaul Blvd NE.

61.    At approximately 4:05 pm, Agents observed ZUBILLAGA come out of room 206, close the door, and get into the gray Hyundai. Agents observed ZUBILLAGA leave the Motel 6.

62.    UC-3 arrived at the Maverick prior to the arrival of ZUBILLAGA.

63.    At approximately 4:13 pm, Agents observed ZUBILLAGA drive to the Maverick and park next to the UC vehicle.

64.    Agents observed ZUBILLAGA get into the front passenger seat of the UC vehicle.

27

65.    ZUBILLAGA provided UC-3 with two more ounces of fentanyl powder and UC-3 provided ZUBILLAGA with $1,500.

66.    At approximately 4:16 p.m., agents observed ZUBILLAGA get out of the UC vehicle and return to the Hyundai.

67.    At approximately 4:23 pm, agents observed ZUBILLAGA leave the Maverick. Surveillance was maintained.

68.    At approximately 5:07 pm, agents observed the Hyundai go to a parking lot at Rio Bravo and Isleta Blvd. Agents observed ZUBILLAGA sitting in the vehicle but agents did not observe ZUBILLAGA meet with anyone.

69.    At approximately 6:04 p.m., agents observed the Hyundai return to the Motel 6 parking lot. Subsequently, Agents observed ZUBILLAGA get out of the Hyundai, walk to room 206, use a motel key to get into the room, and go inside.

70.    At approximately 6:05 pm, surveillance was terminated.

71.    Immediately after the controlled buy, UC-3 returned to the DEA Albuquerque District Office (ADO).  The fentanyl powder was field tested which resulted in a presumptive positive for the presence of fentanyl. The first purchased weighed 97.4 gross grams and the second purchase weighed 125.0 gross grams.  The fentanyl powder was sent to the South Central Laboratory for analysis and it was determined both substances were identified as N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide

(Fentanyl) (calc. as Hydrochloride). The first purchase has a purity of 22% and a net weight of 24.9 grams and the second purchase as a purity of 20% and a net weight of 49.7 grams.

## CONTROLLED PURCHASE #3

72. On the days leading to June 24, 2026, UC-2 was in contact with Erick at telephone number +52-311-909-3812 inquiring about the prices on methamphetamine. Erick told UC-2 the price per pound of methamphetamine would be $1,300. On June 22, 2026, Erick texted UC-2 with his drug prices: $1,300 per pound of methamphetamine, 800 per ounce of fentanyl powder and $1,000 per 1,000 fentanyl pills.

73. On June 24, 2026, at approximately 10:54 a.m., UC-2 contacted Erick at phone number +52-311-909-3812. During this call, UC-2 inquired about purchasing 1 pound of methamphetamine. Erick agreed and told UC-2 to let him know what time and where. UC-2 asked to meet at El Herradero Meat Market located at 2821 Phillips Dr SW, Albuquerque, NM, at 1:30 p.m. Erick told UC-2 that he would be in a grey Hyundai Accent.

74. At approximately 1:22 p.m., UC-2 arrived at the meet location.

75. At approximately 1:31 p.m., Agents observed a grey Hyundai Accent bearing New Mexico license plate CHFF05 arrive to the meet location and park away from the UC vehicle. UC-2 repositioned next to the Hyundai Accent and exited the UC vehicle. UC-2 walked to the Hyundai Accent and got into the front passenger seat.

76. UC-2 greeted ZUBILLAGA who immediately provided UC-2 with a white and blue gas station Styrofoam cup which contained two zip lock bags with the suspected

29

pound of methamphetamine. UC-2 handed ZUBILLAGA $1,300. UC-2 told ZUBILLAGA that UC-2 had an additional $200 and wanted to get a sample of fentanyl pills or fentanyl powder. ZUBILLAGA told UC-2 he would have to call Erick to authorize him to give the samples to UC-2. ZUBILLAGA pulled out his phone and placed a call via WhatsApp. ZUBILLAGA spoke with Erick[3] on speaker phone and told Erick he was meeting with UC-2 and UC-2 was asking for samples. Erick told ZUBILLAGA he could provide UC-2 with whatever samples he had on him.

77.     UC-2 observed ZUBILLAGA remove a clear plastic baggie from underneath the steering wheel column containing a white powdery substance. ZUBILLAGA then reached into the glove box and removed a white sock. The sock contained blue round M30 pills suspected of being fentanyl pills (counterfeit oxycodone). ZUBILLAGA then provided UC-2 with a free sample of fentanyl powder and six suspected fentanyl pills. UC-2 asked ZUBILLAGA if he still had the same phone number to which he stated no. UC-2 then asked if he could get his new number so UC-2 can better coordinate future drug meets. UC-2 provided ZUBILLAGA with UC-2's phone number to which ZUBILLAGA dialed UC-2's phone number. UC-2 received a call from telephone number

---

[3] UC-2 was able to confirm the male ZUBILLAGA spoke with is the same male UC-2 spoke with based on voice comparison.

30

505-668-5757. Once the deal was concluded, UC-2 exited the Hyundai Accent and departed the area in the UC vehicle.

78.    Agents maintained surveillance and followed the Hyundai Accent to 10200 2nd St NW, Space #169, Albuquerque, NM. Agents observed a male wearing a black shirt exit the trailer and get in the front passenger seat of the Hyundai Accent. Approximately 3 minutes later, agents observed the male exit the Hyundai Accent and go back inside space #169. The Hyundai Accent departed the area.

79.    Agents followed the Hyundai Accent to 107 Zorro Dr SE[4], Albuquerque, NM. Agents observed ZUBILLAGA exit the Hyundai Accent and go inside the residence.

80.    At approximately 3:15 pm, surveillance was terminated.

81.    Immediately after the controlled buy, UC-2 returned to the DEA Albuquerque District Office (ADO). The suspected methamphetamine was field tested which resulted in a presumptive positive for the presence of methamphetamine. The sample of fentanyl powder and fentanyl pills were not field tested. The methamphetamine weighed 499.1 gross grams, the suspected fentanyl pills weighed 71.0 gross grams and the suspected fentanyl powder weighed 71.2 gross grams. All the substances were sent to the South Central Laboratory for further analysis.

---

[4] Using Law Enforcement Databases, Agents know this address is listed on ZUBILLAGA's drivers license according to MVD Records.

31

**GPS PING AND TRACKER WARRANT**

82.     On June 29, 2026, TFO Castaneda authored a GPS ping and tracker affidavit for ZUBILLAGA's telephone x5757 and his Hyundai Accent bearing New Mexico License plate CHFF05. The Honorable United States Magistrate Judge Steven C. Yarbrough approved of this warrant on June 29, 2026.

83.     Agents monitored the GPS Ping on ZUBILLAGA's phone throughout the day and noticed that during late night time hours or early mornings, the phone was consistently pinging in the area of Lomas and I-25. Due to the large radius, Agents were not able to locate ZUBILLAGA at a residence. Agents monitored the tracker data for ZUBILLAGA's Hyundai accent which indicated it was parked at 1002 Edith Blvd. NE near Apartment C (the PREMISES) consistently on a nightly basis.

**CONTROLLED PURCHASE #4**

84.     On July 1, 2026, at approximately 12:14 a.m., UC-2 contacted Erick at phone number +52-311-909-3812 via text message. During this conversation, UC-2 inquired about purchasing 3 pounds of methamphetamine. Erick agreed and told UC-2 to let him know what time and where. UC-2 asked to meet at El Herradero Meat Market located at 2821 Phillips Dr SW, Albuquerque, NM, and Erick told UC-2 they could meet at 3:00 p.m.

85.    At approximately 3:03 p.m., agents established surveillance at the meet location and observed the ZUBILLAGA's Hyundai Accent parked in the center parking lot.

86.    At approximately 3:06 p.m., UC-2 arrived at the meet location and parked next to the UC vehicle. UC-2 observed the Hyundai Accent was unoccupied.

87.    At approximately 3:09 p.m., UC-2 observed ZUBILLAGA exit El Herradero store and walk to the Hyundai Accent. ZUBILLAGA placed grocery bags inside the vehicle and retrieved a plastic grocery bag and a small brown leather bag. ZUBILLAGA then got in the front passenger seat of the UC vehicle.

88.    UC-2 greeted ZUBILLAGA who immediately provided UC-2 with a plastic bag containing two Ziplock bags containing two pounds of methamphetamine. ZUBILLAGA then opened the brown leather bag and removed two Ziplock bags containing one pound of methamphetamine. UC-2 then told ZUBILLAGA that UC-2 wanted to call Erick to purchase two additional pounds of methamphetamine. UC-2 attempted to call Erick with no answer. ZUBILLAGA then pulled out his phone and placed a call via WhatsApp. ZUBILLAGA spoke with Erick on speaker phone and told Erick that he passed the phone to UC-2. UC-2 asked ZUBILLAGA about purchasing two additional pounds of methamphetamine for a total of 5 pounds. UC-2 asked Erick if he could get a better price to which Erick stated he could go down to $1,250. UC-2 then told Erick that UC-2 was looking to purchase 10-15 pounds of methamphetamine in the coming weeks.

33

Erick told UC-2 that they could talk price later on. Erick told UC-2 that ZUBILLAGA could meet later in the day. Once the call was concluded, UC-2 gave ZUBILLAGA $3,700 and told him UC-3 would give him the remaining $50 when they meet again for the other two pounds. ZUBILLAGA asked UC-2 to meet at a park near Yucca and Central. UC-2 asked ZUBILLAGA to send UC-2 the address which he did immediately (Pat Hurley Park). ZUBILLAGA exited the UC vehicle and departed the area.

89.    Agents maintained surveillance on ZUBILLAGA following the first meeting with the UC. Agents observed ZUBILLAGA drive to 1002 Edith Blvd. NE and enter Apartment C (the PREMISES). A few minutes later agents observed ZUBILLAGA exit the PREMISES and get back into his grey Hyundai. Agents then observed ZUBILLAGA go back inside the PREMISES, and then walk back out carrying a dark bag and a red notebook, get back into the grey Hyundai and depart the PREMISES and drive directly to the second meet location.

90.    At approximately 4:18 p.m., UC-2 observed ZUBILLAGA arrive at the meet location and walk to the UC vehicle carrying the same brown leather bag. ZUBILLAGA removed two Ziplock bags containing the two pounds of methamphetamine. UC-2 gave ZUBILLAGA $2,560 and told him UC-2 did not have change. Once the deal was concluded, ZUBILLAGA exited the UC vehicle, and the UC departed the area.

91.    Immediately after the controlled buy, UC-2 returned to the DEA Albuquerque District Office (ADO). The suspected methamphetamine was field tested

34

which resulted in a presumptive positive for the presence of methamphetamine and weighed approximately 2,286.5 gross grams. The methamphetamine was sent to the DEA South Central Laboratory and is pending further analysis.

**ARREST OF ZUBILLAGA ON JULY 27, 2026**

92.    On July 27, 2026, ZUBILLAGA was involved in a controlled delivery of approximately two kilograms of suspected fentanyl powder. The controlled delivery was monitored by DEA Las Cruces. ZUBILLAGA was traffic stopped by New Mexio State Police ("NMSP") near Socorro, NM, and was arrested and charged via criminal complaint for 8 U.S.C. §§ 1326(a) and (b) Reentry of Removed Aliens, 26mj3717, signed by the Honorable John F. Robbenhaar.

93.    On July 28, 2026, ZUBILLAGA was indicted for the controlled purchase which took place on July 1, 2026, via a Grand Jury for 21 U.S.C 841 (a)(1) and (b)(1)(A)(viii): that being Distribution of 500 grams or more of a mixture and substance containing methamphetamine.

94.    Based on historical GPS pings from July 27, 2026, it appears that ZUBILLAGA was at his residence located at the PREMISES, at approximately 9:58 a.m. The following ping obtained at 10:28 a.m., shows ZUBILLAGA traveling southbound I-25 near Belen, NM. Agents believe ZUBILLAGA departed directly from the PREMISES and traveled south on I-25 towards Las Cruces where the controlled delivery took place.

35

95.     Agents believe ZUBILLAGA's apartment still contains items of evidentiary value such as drugs, firearms, U.S. Currency, ledgers, etc.

## CONCLUSION

96.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

97.     This affidavit was approved by AUSA Timothy Piatt.

Respectfully submitted,

*Erick D. Castañeda*

Erick D. Castaneda
Task Force Officer
Drug Enforcement Administration

Electronically signed and telephonically sworn
on July 30, 2026:

THE HONORABLE JOHN F. ROBBENHAAR
UNITED STATES MAGISTRATE JUDGE

36

## ATTACHMENT A

*Property to be searched*

The property to be searched is 1002 Edith Blvd NW, Apt-C, Albuquerque, NM, hereinafter "PREMISES," further described as single story property that is attached. The property contains three apartments (A, B and C). The building is a light ping or beige stucco with a brown pitched singled roof. The front door to apartment C is grey in color and has the letter C affixed to on the door in black color.



The search of the above PREMISES shall include the search of the entire residence, all attached and unattached garages and storage areas/containers (including mailboxes and trash cans) on the PREMISES, and all persons located in the PREMISES in or on which the items to be seized could be concealed.  The search shall also include all vehicles parked at, or in front of, the PREMISES that have an apparent connection to the PREMISES and/or the SUBJECTS. Connection to the vehicle may be established by evidence that anyone residing at the PREMISES and/or the SUBJECTS own, operate, and/or have access to any vehicle parked at or in front of the PREMISES. Evidence includes prior law enforcement observation, vehicle registration, subject admission, or possession of an ignition key.

## ATTACHMENT B

*Property to be seized*

All records, information, and evidence relating to violations of 21 U.S.C. § 841 – Distribution and possession with intent to distribute controlled substances; and 21 U.S.C. § 846 – Conspiracy to distribute and possess with intent to distribute controlled substances, those violations involving Raudel ZUBILLAGA Rey and occurring after January 29, 2026, to July 28, 2026, specifically:

1. Controlled substances, including, but not limited to, methamphetamine, heroin, cocaine, and marijuana.

2. Drug paraphernalia, including but not limited to, scales, packaging materials, items for packaging and handling drugs.

3. Large amounts of currency, financial instruments, precious metals, jewelry and other items of value and/or proceeds of drug transactions.

4. Any and all drug customer lists, drug records, dealers lists, or any notes containing the individual names of such persons, telephone numbers, addresses of these customers or dealers, and any corresponding records of accounts receivable, money paid or received, drugs supplied or received, or cash received to pay for controlled substances or intended to pay for controlled substances.

5. Telephone and address books or notes containing telephone numbers and addresses of co-conspirators.

6. Telephone toll records for homes and/or businesses owned or controlled by suspected co-conspirators, or other communication devices used by them and/or their drug trafficking associates.

7. Messages, notes, correspondence, and/or communications between drug trafficking associates.

8. Indications of ownership or control of said premises and/or other premises used in unlawful drug trafficking activity, including but not limited to, utility bills, cancelled checks, or envelopes and deeds or leases.

9. Indications of ownership or control over any vehicles located at the place to be searched, including but not limited to, titles, registrations, gas receipts, repair bills and keys belonging to that vehicle.

10. Records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks received, passbooks, bank checks, safe deposit box keys, vault keys, safes and other items evidencing the obtaining, secreting and/or concealment, and or expenditures of money.

11. Any and all financial or other instruments evidencing placement of assets in the names other than the names of the drug traffickers themselves.

12. Books, records, receipts, diaries, notes, ledgers, airline tickets, cashier's checks, money orders and other papers relating to the transportation, ordering, sale and distribution of controlled substances and the outstanding debts and collections from controlled substances that have been distributed.

13. Photographs or videos of the drug traffickers, their co-conspirators and the property and assets purchased with drug proceeds.

2

14. Other financial records, which may include airline ticket receipts, credit card receipts, rental car receipts and luggage tags reflecting points of travel.

15. Firearms and ammunition, including but not limited to handguns, rifles, shotguns and automatic weapons.

16. Digital video surveillance systems, including the associated storage media.

17. Any and all computers, digital media, and storage media that reasonably appear to contain some or all of the records, information, and/or evidence described in Attachment B.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer, digital media, or storage media; any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital media" includes personal digital assistants (PDAs), smartphones, tablets, BlackBerry devices, iPhones, iPods, iPads, digital cameras, and cellular telephones.

The term "storage media" includes any physical object upon which electronic data can be recorded, such as hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media or digital medium.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

This warrant authorizes a review of all electronic media seized pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The warrant also authorizes a review of all electronic media for evidence of who used, owned, or controlled the electronic media at the time the things described in this warrant were created, edited, or deleted. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, law enforcement may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual who is found at the PREMISES and reasonably believed by law enforcement to be a user of a device found at the premises, to the fingerprint scanner of the device; (2) hold a device found at the premises in front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.